

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

CMM:MJB
F. #2019R01483

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 8, 2021

<u>By E-Mail and ECF</u>

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Aaron Weinreb
     <u>Criminal Docket No. 20-006 (BMC)</u>

Dear Judge Cogan:

   The government respectfully submits this letter in advance of the defendant Aaron Weinreb's sentencing, which is scheduled for June 15, 2021.  For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 87 months' imprisonment followed by ten years' supervised release.

I.  <u>Background</u>

   The defendant stands convicted, following a guilty plea pursuant to a plea agreement, of coercion and enticement to engage in criminal sexual activity, in violation of Title 18, United States Code, Section 2422(a).  The plea agreement permits the parties to advocate for a prison sentence between 60 and 87 months, and further stipulates that ten years' supervised release is appropriate.  Pl. Ag. ¶ 2.[1]  Pursuant to Fed. R. Crim. P. 11(c)(1)(B), neither parties' recommended sentence is binding on the Court.

   From approximately May 2019 until his arrest on October 29, 2019, the defendant, using the online dating application Grindr, coerced and enticed two minors to meet him, separately, for sexual activity.  (PSR ¶¶ 9 – 28).  The 48-year-old defendant engaged in sexual activity with John Doe #1 on three separate occasions in hotels and his car.  John Doe #1 was fourteen years old during the first sexual encounter, and fifteen years old

---

[1]  The plea agreement is attached as Exhibit A and will be referenced as "Pl. Ag."

during the subsequent two sexual encounters.  The defendant met with fifteen-year-old John Doe #2 on one occasion where they engaged in sexual activity inside the defendant's vehicle.

      A.  <u>John Doe #1</u>

John Doe #1 first met the defendant on Grindr when he was a freshman in high school.  The two exchanged phone numbers and arranged to meet.  The defendant attempted to conceal his true identity and referred to himself in person and online as "David."  Their first physical encounter occurred when the defendant picked John Doe #1 up after school and drove to a hotel where they engaged in oral and anal sex.

The second sexual encounter occurred in May 2019 after the defendant asked John Doe #1 if he was underage.  John Doe #1 advised the defendant he was underage and the defendant replied, in sum and substance and in part, that he knew his actions were wrong, yet he drove John Doe #1 to a hotel where they engaged in sex.  (PSR ¶ 23).

On May 19, 2019, only days after the second sexual encounter, the defendant sent John Doe #1 a message that stated in sum and substance:[2]

> <u>Defendant</u>: "U there….you ok? Was I mean yesterday? Was I too aggressive? Did I scare you? I'm sorry"
>
> <u>John Doe #1</u>: "Yes you did"
>
> <u>Defendant</u>: "I was trying to demonstrate what our relationship probably is.. an older taking advantage of a vulnerable child.. I'm sorry. I didn't mean to hurt you.."[3]

On May 22, 2019, the defendant sent John Doe #1 a message that stated in sum and substance, "I was strong last time.. but i was just showing you what an older guy does when he is so excited and sexually aroused."

The third sexual encounter occurred on or about June 4, 2019 when John Doe #1 was preparing for an international trip with his family.  (PSR ¶ 9).  The defendant picked John Doe #1 up and drove him to a hotel where they engaged in sex.

---

[2]     The text messages and chats between the defendant and John Doe #1 were produced in discovery on April 1, 2020, bates-numbered SDM_WEINREB000011 – WEINREB000027.

[3]     Typographical errors appear in the original text of the messages, and have therefore not been corrected.

At various times throughout their relationship, the defendant provided John Doe #1 with cash (totaling less than $1,000) and a pair of Apple airpods. (PSR ¶ 25). The defendant also threatened to expose John Doe #1 as a prostitute if he told anyone about the sexual encounters.

Following the third sexual encounter, and knowing John Doe #1 was 15, the defendant continued his sexual pursuit of John Doe #1. On June 11, 2019, the following text exchange occurred:

> Defendant: "When can we meet that you will be really really horny and not tired??? I want you badly.. I'm available today"
>
> John Doe #1: "I can't this whole week, lots of school work"
>
> Defendant: "I can't wait that long.. are you in school today?"

In the days that followed, the defendant's attempts to entice John Doe #1 to engage in sexual activity continued. On June 14, 2019, the defendant texted John Doe #1 and asked, "Im in the area right now.. you want to say hello?" Five days later, on June 19, 2019, the defendant proclaimed, "I'm available between 10 and 1045 this morning."

### B. Law Enforcement Investigation

After learning of John Doe #1's sexual victimization, Special Agents with the Federal Bureau of Investigation ("FBI") assumed the electronic identity of John Doe #1 and quickly established that the defendant was aware of John Doe #1's age. On October 24, 2019, the following text exchange occurred:

> FBI: "You want to be with me still?"
>
> Defendant: "Yes. Do you?"
>
> FBI: "But what about my age? I do miss you"
>
> Defendant: "I'm ok with it.. at this point I trust you. If you or I wanted to get each other in trouble, we could have done it already.. The fact that we haven't shows that we can trust each other.. We just need to be careful that people don't see us

From there, the defendant sent hyper-sexualized messages to the FBI, although the defendant believed his messages were being sent to 15-year-old John Doe #1. A sampling of the defendant's messages from October 24, 2019 are contained below:

> Defendant: "I do love when you suck my dick and when we cuddle your dick is always solid hard"

3

<u>Defendant</u>: "Just imagining you crossing the street heading towards my car, gets me hard"

<u>Defendant</u>: "Do you masturbate over me?"

<u>Defendant</u>: "I would like to caress you and make love to you… Kiss your whole beautiful body till you explode.."

<u>Defendant</u>: "it's hard to work and text, especially with my dick so rock hard for you"

<u>Defendant</u>: "my pelvis is on fire now..lol..I'll try to wait"

During one text exchange on October 24, 2019, the defendant continued his sexual pursuit of John Doe #1 and re-established his knowledge that John Doe #1 was a minor. The exchange is below:

<u>FBI</u>: "My parents have been so annoying lately"

<u>Defendant</u>: "Lol, I would be too if I had a 16 year old"

<u>FBI</u>: "Yea"

<u>Defendant</u>: "Just finished work..I assume not today??"

<u>FBI</u>: "I'm sorry, just still sick"

<u>Defendant</u>: "I don't mind. But no worries.. But then maybe Tuesday afternoon."

<u>FBI</u>: "Yes Tuesday but I have school stuff into the afternoon"

The defendant continued to discuss the meeting scheduled for Tuesday, October 29, 2019 and declared "I want to cuddle with you and feel your hard dick pressed up against me while we snuggle" and "I want to kiss you now..I can't wait till Tuesday"

On October 27, 2019, two days prior to the scheduled meeting, the following exchange occurred:

<u>FBI</u>: "Where are we going from there?"

<u>Defendant</u>: "Very nice hotel down the block.. not like the place before.. You'll like it.. and we are going to make love to each other in a beautiful way"

4

>FBI: "I love that"
>
>FBI: "And you promise you're ok with my age?"
>
>Defendant: Are you 15 or 16? Be honest"
>
>FBI: "I am 15, does that change things? I just want to be honest because I know you really care for me"
>
>Defendant: "I suspected so.. but then you said you were a sophomore.. Wow.. Where you 14 the first time we met?"
>
>FBI: "Yes"
>
>Defendant: "Omg.. my body is shaking now"

Later that same day (October 27, 2019), the following exchange occurred:

>Defendant: "We are on for Tuesday!! And my dick is hard as a rock thinking about it" and "I want you to fuck me"
>
>FBI: "Can you bring lube?"
>
>Defendant: "Yes"
>
>C. The Defendant's Arrest

On the day of the scheduled meeting, October 29, 2019, the defendant messaged John Doe #1 (FBI) that he reserved a room at the King's Hotel at 820 39th Street in Brooklyn, New York. The FBI intercepted the defendant once he arrived at the hotel and questioned him.

The defendant waived his Miranda warnings and initially informed the FBI that he was a doctor, was at the hotel for a nap and that he had "nothing to hide."[4] He later minimized his involvement with John Doe #1 and stated that he met an "Asian kid" two or three times before for "sexual stuff" but stated "there was never penetration." The defendant continued to minimize his illegal conduct and later stated that he thought he should get a lawyer. Shortly thereafter, not in response to questioning, the defendant asked the FBI questions about the investigation. The FBI informed the defendant that they could not speak with him unless he acknowledged, understood and waived his Miranda warnings a second time. The defendant did so and continued his conversation with the FBI.

---

[4] The defendant's interview was audio recorded and produced in discovery on April 1, 2020, bates-numbered WEINREB00001 – WEINREB000002.

5

After the defendant waived Miranda a second time, he admitted to the FBI that he met John Doe #1 on two or three occasions and engaged in oral sex, even after John Doe #1 advised he was 16 years old. The defendant further admitted that he engaged in oral sex with John Doe #2 on one occasion, approximately two months prior. The defendant repeatedly blamed his illegal conduct on his "stupid addiction" to sex.

D. John Doe #2

Like John Doe #1, the defendant met John Doe #2 on Grindr. (PSR ¶ 26). During his interview with the FBI, the defendant admitted that he engaged in oral sex with John Doe #2 on one occasion when he knew the victim was 16. A Child Advocacy Center interview of John Doe #2 revealed that John Doe #2 was 15 during the sexual encounter and that the defendant engaged in oral and anal sex with John Doe #2.

E. Procedural History

The defendant was arrested by the FBI on October 29, 2019 and was arraigned the next day before United States Magistrate Judge Robert M. Levy on a complaint (19-MJ-1014) charging him with one count of coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b). Against the recommendation of Pre-Trial Services ("PTS") and over the government's objection, the defendant was released on a $1.5 million bond.

On January 15, 2020, the defendant was arraigned before United States Magistrate Judge Ramon E. Reyes, Jr. on indictment 20-CR-006 (BMC) charging him with two counts of coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b). Against the recommendation of PTS and over the government's objection, the defendant's bail conditions continued unaltered.

The defendant pled guilty before this Court on February 26, 2021 to a sole-count superseding information charging coercion and enticement to engage in criminal sexual activity, in violation of 18 U.S.C. § 2422(a). The guilty plea was pursuant to a duly executed plea agreement. See Pl. Agg., attachment A.

F. Violations of Pre-Trial Release

The defendant violated his cyber monitoring condition of release on three separate occasions, November 11, 2019, November 21, 2019 and October 9, 2020. (PSR ¶¶ 4, 5). In the first two incidents, the defendant asked third parties to conduct online research for him using unmonitored computers. On the third incident, the defendant admitted using his father's unmonitored smartphone to access the online application WhatsApp to communicate with his daughter. The defendant explained to PTS that his ex-wife ("ex-wife") blocked his number, which is why he used his father's cellular telephone. The

6

defendant claimed he did not use his father's unmonitored device for any other purpose, although his claim could not be corroborated by PTS.

The final violation of release involved the defendant's attempt to access his ex-wife's financial information. (PSR ¶¶ 6 – 8). On October 7, 2020, the ex-wife received a letter from Chase Bank ("Chase") thanking her for a recent inquiry and enclosed certain financial documents. The ex-wife was confused by the letter because she and her son were the only authorized users of the account, and neither of them contacted Chase to request the enclosed financial records. When the ex-wife telephoned Chase in response to the letter she received, a representative indicated that a male with a phone number ending in 3160 (the defendant's cell phone number ends in 3160) requested the documents and claimed to be an authorized user of the account. The ex-wife later alleged in a police report filed with the Nassau County Police Department that the Chase representative indicated that the defendant impersonated his son, Adam Weinreb, in an effort to secure the financial information because it was needed for income tax and divorce proceeding purposes. Despite efforts to secure dispositive evidence regarding the alleged impersonation, neither PTS nor the government were able to definitively provide the Court with such evidence. The government did, however, receive documentation from Chase that the account in question was created in November 2019 (after the defendant's arrest on the instant charges) and the defendant was not an authorized user of the account. (PSR ¶ 8).

II.     Guidelines Calculation

The government agrees with the Offense Level computation set forth in the PSR, and the Probation Department's determination that the defendant falls within Criminal History Category I.

| | | |
|---|---|---:|
| | Base Offense Level (§ 2G1.3(a)(4)) | 24 |
| Plus: | Undue Influence (§ 2G1.3(b)(2)(B)) | +2 |
| Plus: | Use of Interactive Computer Service (§ 2G1.3(b)(3)(B)) | +2 |
| Plus: | Sex Act or Sexual Conduct (§ 2G1.3(b)(4)(A)) | +2 |
| Total: | | <u>32</u> |

The plea agreement did not account for the Special Instruction at U.S.S.G. § 2G1.3(d)(1) regarding multiple minor victims, and thus under-represented the total offense level by 2 points. <u>See</u> Pl. Agg. ¶ 2. Therefore, the PSR total offense level is 32, whereas the total offense level in the plea agreement is 30.

The defendant's guilty plea afforded him a three-point reduction pursuant to U.S.S.G. §§ 3E1.1(a) and (b). Using the PSR's Guidelines Calculation, this resulted in an adjusted total offense level of 29 and a corresponding range of imprisonment of 87 – 108

7

months. Using the Guidelines Calculation contained in the plea agreement, the total adjusted offense level is 27 with a corresponding range of imprisonment of 70 – 87 months. Notwithstanding the total offense level difference between the PSR and the plea agreement, the government's request for 87 months' incarceration falls within the Guidelines range of both the PSR and the plea agreement.

III.    Sentencing

    A. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). In Booker, the Supreme Court held that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. Title 18, United States Code, Section 3553(a) provides in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set for in paragraph (2) of this section. The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense . . . ;
>
> (2) the need for the sentenced imposed --
>
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B) to afford adequate deterrence to criminal conduct;
>
>     (C) to protect the public from further crimes of the defendant;
>
>     (D) to provide the defendant with needed educational or vocational training; medical care, or other corrections treatment in the most effective manner; . . . .

8

### B. 87 Months' Imprisonment is Appropriate

Using Grindr, the defendant repeatedly coerced and enticed John Doe #1 to engage in sexual activity when he knew the victim was a minor. The defendant successfully coerced John Doe #2 on one occasion to engage in illegal sexual activity. The defendant's relentless pursuit of the victims resulted in two 14 and 15-year-old boys being sexually abused on four separate occasions.

The defendant was more than 30 years older than his victims and even acknowledged, in writing, the power dynamic at play: "an older taking advantage of a vulnerable child." See SDM_WEINREB000027, message # 492. Therefore, 87 months' incarceration, which is within the Guidelines range of both the PSR and the plea agreement, is sufficient, but not greater than necessary, to comply with the directives set forth in 18 U.S.C. § 3553(a). The government also requests ten years' supervised release and restitution as set forth in the plea agreement.

#### i. Nature and Seriousness of the Offense

There can be no doubt that the defendant's criminal offense is serious and demands a significant prison sentence. The defendant was approximately 48 years old when he took advantage of two vulnerable 14 and 15-year-old boys. The defendant was aware of John Doe #1's vulnerability and exploited it from his position of power. As a result, both victims have suffered significant psychological harm which has caused John Doe #2 to attend countless hours of therapy, with no end in sight. The defendant's actions also caused substantial harm to John Doe #2's family.

The government expects John Doe #2's family to submit victim-impact statements to the Court. As of this filing, the undersigned has not received the submissions and therefore defers to those submissions to fully describe the extent of damage caused by the defendant's criminal sexual conduct.

#### ii. Providing Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant

A significant prison sentence is also necessary to provide adequate deterrence and to protect the public from further crimes of the defendant. As the Supreme Court noted in United States v. Kebodeaux, 133 S. Ct. 2496 (2013), "There is evidence that recidivism rates among sex offenders are higher than the average for other types of criminals." (quoting Dept. of Justice, Bureau of Justice Statistics, P. Langan, E. Schmitt, & M. Durose, Recidivism of Sex Offenders Released in 1994, p. 1 (Nov. 2003) (reporting that compared to non-sex offenders, released sex offenders were four times more likely to be rearrested for a sex crime, and that within the first three years following release 5.3% of released sex offenders were rearrested for a sex crime)).

The defendant is a sex addict who "compulsively and clandestinely sought out sex with men." (Def. Sent. Memo at 6). He "compulsively [sought] out men for the purpose of having sex … [met] strangers on gay hook up apps, [had] sex with them, [got] his fix and then [went] home." (Def Sent. Memo at 18). The defendant was "powerless over his addiction" (Id.), which is precisely what makes him a danger to reoffend and what caused him to prey upon innocent boys and engage in criminal sexual conduct in the first instance.

At the time of his arrest, the defendant admitted being addicted to homosexual sex. While his sex addiction is not exclusive to minors, he admitted that he "couldn't say no" to sex with minors because he's "horny." During the defendant's approximate one-hour interview with the FBI, he mentioned approximately ten times that he has a sex addiction that he is unable to control despite multiple previous efforts, including therapy. The defendant's unsuccessful attempts to address his sex addiction began in 1995. (PSR ¶ 81). On at least four occasions prior to his arrest, the defendant sought professional mental health treatment regarding his addiction. (Id.). Indeed, the defendant's sentencing memorandum details his life-long addiction to sex and "addiction to lust." (Def. Sent. Memo at 3).

Notably, the defendant was unsuccessful at First Light Psychological Services ("First Light") where, at the recommendation of counsel, he sought mental health treatment. (PSR ¶ 83). The defendant ceased treatment from First Light in June 2020. According to the treatment summary discharge, the defendant was not receptive to addressing his obsessive thought patterns that promoted self-destructive behaviors. (PSR ¶ 83). First Light noted that the defendant reacted poorly when he was not in complete control of every aspect of his treatment, and also reacted poorly when he was unable to manipulate his therapist or psychiatrist into adhering to his demands. (Id.). First Light also reported that the defendant sought treatment elsewhere, in part, due to First Light's refusal to endorse disability paperwork submitted by the defendant erroneously indicating that the defendant was unable to work due to his mental illness, as opposed to his legal issues. (Id.).

The defendant has assured this Court that he will not reoffend. In support, he provided reports from Drs. Gaines, Lewenstein and Nudman. Dr. Gaines remotely evaluated the defendant a total of three times in a one-week span in May 2021. Dr. Lewenstein has treated the defendant for approximately 13 months, beginning in May 2020. Dr. Nudman has treated the defendant for approximately 11 months, beginning in July 2020. Dr. Gaines opined that the defendant "is at a low risk of harm to others at the present time." (Def. Ex. 16 at 26). Dr. Lewenstein opined that the defendant "does not pose any threat to children, and it is difficult to imagine any circumstance that might cause him to re-offend." (Def. Ex. 18 at 4). Dr. Nudman did not opine on the likelihood of the defendant reoffending, but rather concluded that the defendant has "a good prognosis … moving forward." (Def. Ex. 19 at 2).

The defendant has spent a lifetime unsuccessfully attempting to control his compulsive sexual desires through religion, therapy and medical intervention, yet Dr. Gaines, who virtually met the defendant on three occasions, concluded that he poses a "low risk" to reoffend. Dr. Gaines, who is not licensed to practice in New York, based her opinion on limited and incomplete data. She did not review the defendant's graphic and sexually

predatory text exchanges with John Doe #1, nor did she review the defendant's audio-recorded interview with the FBI. Further, Dr. Gaines' CV is devoid of a specialization in adult-child sexual behavior specifically, or criminal sexual behavior generally. The government also questions the timing of her evaluation, less than a month before sentencing and only one day after new counsel filed his notice of appearance. In sum, given the relative short time these doctors have spent with the defendant, their conclusions should not serve as the conclusive authority on the defendant's recidivism risk.

The defendant's current psychologist, Dr. Lewenstein, opined that, despite the defendant's admitted sex with children, he (Dr. Lewenstein) does not believe the defendant is attracted to minors, and thus, has no concerns regarding the defendant reoffending. (PSR ¶ 84). However, Dr. Lewenstein's opinion highlights the defendant's core problem of self-control. (Id.). This is the precise issue that the defendant admitted to during his FBI interview, and also one of the principal problems identified by First Light. If the defendant cannot control his impulses and sex addiction, minor boys are no safer today from the defendant than they were prior to his arrest. The defendant's inability to control his sex addiction places minor boys at risk, because the defendant, in his own words, "can't say no," to sex whether it be with a consenting adult or minor child.

        iii.        Promoting Respect for the Law and Providing Just Punishment

Pursuant to 18 U.S.C. § 3553, the Court should promote respect for the law and provide just punishment to a defendant in determining an appropriate sentence. This factor is known as the "just deserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. See United States v. Irey, 612 F.3d 1160, 1206 (11th Cir. 2010). The Irey court cited the Senate Report regarding this provision:

> This purpose--essentially the "just deserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

Id.

Because the "punishment should fit the crime, the more serious the criminal conduct is, the greater the need for retribution and the longer the sentence should be. The seriousness of the crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." Id. This is especially true here because "child sex crimes are among the most egregious and despicable of societal and criminal offenses." Id.

The seriousness of this offense cannot be overstated. Children must be protected, not exploited. Our laws recognize a child's vulnerabilities and appropriately permit firm and just penalties. The defendant has caused, and will continue to cause, devastating emotional consequences for both minor victims, as well as their families.

The government questions whether the defendant has honestly accepted responsibility for his crimes. Despite pleading guilty, the defendant repeatedly blames his criminal conduct on his sex addiction and his religion's prohibition against homosexual behavior. These excuses are unacceptable. Neither his religion nor his addiction forced him to have sex with minors. To be clear, the defendant was not charged with any crime related to a sex addiction or homosexuality. Rather, the defendant is before the Court because he engaged in criminal sexual conduct with two 14 and 15-year-old children.

The defendant has gone to great lengths trying to convince this Court that he is not a pedophile. (Def. Sent. Memo at 19, 22, 35 and 37). This further demonstrates his failure to accept responsibility. The undisputed facts of this case established that the defendant, after knowing John Doe #1 was a minor, repeatedly communicated with the victim using hyper-sexual language and thereafter engaged in criminal sexual conduct. The texts and sex acts with the victims clearly demonstrate the defendant's attraction to minors. The defendant can continue to assert that he is not a pedophile, but the bottom line is that he engaged in criminal sexual conduct with two 14 and 15-year-old children on multiple occasions.

Moreover, the statement that the defendant "had never, ever sought out a minor nor was he seeking one at the time of engagement with [John Doe #1]" is misleading. (Def. Sent. Memo at 37). While the defendant may not have specifically sought out a minor for sexual activity initially, the defendant actively and relentlessly pursued John Doe #1 for sex after he knew the victim's true age.

Finally, as he has done since the inception of the case, the defendant blamed the victims, albeit subtly, for using an 18-and-over dating app. While on Grindr, John Doe #1 "represented himself as being 18, and [the defendant] had no reason to believe otherwise." (Def. Sent. Memo at 20). This statement is belied by logic and the evidence. John Doe #1 was 14 when they first met, and he did not look, speak, text or act like an 18-year-old. The defendant picked John Doe #1 up after school and they frequently discussed issues regarding John Doe #1's schoolwork. Moreover, Grindr does not employ an age-verification process to ensure users are 18. As a prolific user of Grindr, the defendant knew this. Grindr's "age-verification process" consists of the user self-disclosing a birthday, or simply selecting an age from a drop-down menu. To imply that the defendant was somehow "duped" by the victims is an attempt to blame the victims for the defendant's own criminal conduct and, quite frankly, offensive.

12

IV.     Conclusion

For the reasons set forth above, the Court should impose a sentence of 87 months' imprisonment, followed by ten years' supervised release and restitution.

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By:   /s/   Michael J. Bushwack
Michael J. Bushwack
Assistant U.S. Attorney
(631) 715-7878

cc:     Clerk of the Court (BMC) (by ECF)
        Saul Bienenfeld, Esq., counsel for defendant (by ECF)
        Probation Officer Patricia Sullivan, United States Probation (by E-mail and ECF)